# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# CENTRAL DIVISION

| | | |
|---|---|---|
| JERRY D. CRUM, M.D. | ) | |
| and | ) | |
| DOUGLAS C. RICHARDS, D.O., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 05-4203-CV-C-NKL |
| | ) | |
| MISSOURI DIRECTOR OF | ) | |
| REVENUE | ) | |
| and | ) | |
| MISSOURI STATE BOARD OF | ) | |
| REGISTRATION FOR THE | ) | |
| HEALING ARTS, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

The parties have filed cross motions for summary judgment. Plaintiffs' Motion is

Doc. # 36, the Missouri Director of Revenue's ("DOR") Motion is Doc. # 32, and the

Missouri State Board of Registration for the Healing Arts's ("the Board") Motion is Doc.

# 33. For the reasons set forth below, the Court grants the Motions of DOR and the

Board and denies Plaintiffs' Motion.

## I.      Background

### A.      The Missouri Statute

Missouri law authorizes the revocation of the license of any physician who fails to

comply with certain Missouri tax laws. Mo. Rev. Stat. § 324.010 states:

1

All governmental entities issuing professional licenses, certificates, registrations, or permits pursuant to [statutory citations][1] shall provide the director of revenue with the name and Social Security number of each applicant for licensure with or licensee of such entities within one month of the date the application is filed or at least one month prior to the anticipated renewal of a licensee's license.  If such licensee is delinquent on any state taxes or has failed to file state income tax returns in the last three years, the director shall then send notice to each such entity and licensee.  In the case of such delinquency or failure to file, the licensee's license shall be suspended within ninety days after notice of such delinquency or failure to file, unless the director of revenue verifies that such delinquency or failure has been remedied or arrangements have been made to achieve such remedy.  The director of revenue shall, within ten business days of notification to the governmental entity issuing the professional license that the delinquency has been remedied or arrangements have been made to remedy such delinquency, send written notification to the licensee that the delinquency has been remedied.  Tax liability paid in protest or reasonably founded disputes with such liability shall be considered paid for the purposes of this section.

Mo. Rev. Stat. § 324.010 (also referred to as HB 600).  This law went into effect in 2003.

**B.**    **Notice**

Plaintiffs, Dr. Jerry D. Crum ("Crum") and Dr. Douglas C. Richards ("Richards") were licensed physicians in Missouri at the time Mo. Rev. Stat. § 324.010 was passed. They received notification of the new law when the Board sent them their 2004 license renewal packets which contained a notice that their license would be at risk if they either failed to pay taxes or failed to file tax returns in the last three years.  Both Plaintiffs received the packets and submitted their renewal applications without incident in late 2003 and early 2004.  *See* Crum Dep. at p. 35; Richards Dep. at p. 25; Steinman Dep. at

---

[1]Section 324.010 does not apply to all licensed professionals in the state of Missouri.

p. 42.

### 1. *Crum*

On January 21, 2004, DOR mailed a "Request for Tax Return" ("Request") to Crum at his office in Rolla, Missouri. Crum admits that he used his office address for business purposes and that if he failed to receive mail at his office, then that failure was attributable to his staff and not to an incorrect address. *See* Crum Dep. at pp. 22-23.

DOR's Request stated:

> The Department of Revenue's records indicate that you have not filed a 2000 Missouri individual income tax return. If you do not file the return and pay, or make satisfactory arrangements for payment of the balance due within 90 days of the date of this notice, your professional license, certificate registration, or permit will be revoked by operation of law (HB 600, 2003).

*See* Board Ex. 4 at p. 2. DOR sent identical notices to Crum for the 2001 and 2002 tax years. *Id.* at pp. 11 (2001 tax year) and 22 (2002 tax year). Each Request ordered Crum to respond by April 20, 2004, and instructed Crum to respond even if he did not believe that he was obligated to file a tax return. The Requests clearly identified what Crum needed to do.

On January 29, 2004, DOR received a mailing from Dr. Crum's office. It contained DOR's original Request mailed to Dr. Crum on January 21, 2004, and a federal tax form titled "Request for Taxpayer Identification Number and Certification." The tax form was signed by Crum's office administrator. There is no apparent correlation between DOR's January 21, 2004, Request and Crum's January 29, 2004, response. *See*

3

Board Ex. 4 at p. 1; Crum Dep. at p. 31.

On February 10, 2004, DOR sent a letter to Crum acknowledging receipt of his mailing of January 29, 2004, and again notifying him that the DOR did not have his tax returns for 2000, 2001 and 2003.

On April 7, 2004, DOR submitted Notices of Deficiency ("Notices") to Crum for the tax periods 2000, 2001, and 2002. *See* Board Ex. 4 at pp. 3-5 (2000), 12-14 (2001), and 23-25 (2002). According to the Notice, Crum owed a total of $47,679.15 in unpaid taxes for the three year time period, which included penalties and interest.[2] The Notices advised Crum that they were his final notice to pay the taxes. They also advised him that he could object by filing a protest within sixty (60) days. Included with the Notices was a form titled "How to Respond to a Notice of Deficiency" which spelled out Crum's protest and appeal rights as well as his obligation to respond within sixty days.

On June 25, 2004, having heard nothing from Crum, DOR issued a Certificate of Non-Compliance. *See* Pl. Ex. 1. The Certification, which was signed by DOR's Director, stated:

> The Department of Revenue hereby certifies that a tax return and/or taxes are due from the above taxpayer. Notice was sent to the taxpayer and 90 days have elapsed. The taxpayer has not remedied the failure to file the tax return and/or pay the tax delinquency, made arrangements to achieve a remedy, paid the tax liability in protest, or asserted a reasonable founded basis for the failure to pay. Pursuant to [section 324.010], the professional license, certificate, registration, or permit of the taxpayer shall be

---

[2]When a taxpayer does not file a return, the DOR makes an assessment based on the limited information available to DOR.

REVOKED.

*See* Pl. Ex. 1.  DOR sent the Certification to the Board.

On June 29, 2004, the Board sent Crum a letter notifying him that his license was going to be revoked on July 21, 2004.  *See* Pl. Ex. 2.  The Board's notification was sent via certified mail.

Crum contacted DOR on July 21, 2004, and stated that he was working on filing his tax returns for 2000 through 2003, but that he needed an extension of time.  *See* Board Ex. 4 at p. 1.  DOR explained to Crum that it would not grant him an extension of time.

Crum paid his delinquent taxes for 2000 through 2002 on September 30, 2004, and DOR issued a Certificate of Tax Compliance to Crum.  *Id.*  Crum's license was reinstated as of September 30, 2004.

### 2.    *Richards*

On January 21, 2004, DOR also mailed a Request to Richards asking that he file a tax return for 2001.  The Request was sent to P.O. Box K, Lockwood, Missouri 65682-0365.  The Request stated,

> The Department of Revenue's records indicate that you have not filed a 2001 Missouri individual income tax return.  If you do not file the return and pay, or make satisfactory arrangements for payment of the balance due within 90 days of the date of this notice, your professional license, certificate registration, or permit will be revoked by operation of law (HB 600, 2003).

*See* Board Ex. 4 at p. 2.  DOR sent an identical Request for the 2002 tax period.  *Id.* at pp. 16.  Each Request ordered Richards to respond by April 20, 2004 and they instructed him

to respond even if he did not believe he was obligated to file a tax return. They were sent via regular mail and were not returned to DOR.

On April 7, 2004, DOR submitted Notices to Richards for the 2001 and 2002 tax periods. *See* Board Ex. 4 at pp. 3-5 (2001) and 17-19 (2002). The Notices were sent via Certified Mail, but were returned to DOR unclaimed.

All of the correspondence sent by DOR to Richards was sent to Richards's post office box at Lockwood. This was the address that Richards listed on his 2004 medical license renewal application. *See* Richards Dep. at p. 25. According to Richards's responses to interrogatories, he continues to use the post office box as a current address and he listed that address on the delinquent tax returns he ultimately filed in September 2004. It was also the address he used on his tax returns for the years 1997 to the present. *See* Board Ex. 7. Richards admits that he retrieves mail from his Lockwood post office box only 6.58% of the calendar days per year--roughly 24 days a year. *See* Board Ex. 7.

On June 25, 2004, having heard nothing from Richards, DOR issued a Certificate of Non-Compliance. *See* Pl. Ex. 3. The Certification, which was signed by DOR's Director, stated:

> The Department of Revenue hereby certifies that a tax return and/or taxes are due from the above taxpayer. Notice was sent to the taxpayer and 90 days have elapsed. The taxpayer has not remedied the failure to file the tax return and/or pay the tax delinquency, made arrangements to achieve a remedy, paid the tax liability in protest, or asserted a reasonable founded basis for the failure to pay. Pursuant to [section 324.010], the professional license, certificate, registration, or permit of the taxpayer shall be REVOKED.

6

*See* Pl. Ex. 1.  DOR sent the Certification to the Board.

On June 29, 2004, the Board sent Richards a letter notifying him that his license would be revoked as of July 21, 2004.  *See* Pl. Ex. 5.  This notification was sent via certified mail, but was returned unclaimed.

Richards paid his delinquent 2001 and 2002 state taxes on September 2, 2004, and the Board reinstated his medical license the same day.  Richards admitted in his deposition that he knew he had an obligation to file a tax return, regardless of whether he believed he was entitled to a refund.  *See* Richards Dep. at pp. 37-38.  He also testified that he often ignores notices of certified mail because he receives incorrect notices from the Division of Child Support Enforcement.  *See* Richards Dep. at p. 48.

### 3.    *Reporting*

After July 21, 2004, the Board reported the revocation of Plaintiffs' licenses to the Healthcare Integrity and Protection Data Bank ("HIPDB"), the National Practitioner Data Bank ("NPDB"), and the Federation of State Medical Boards of the United States, Inc. ("the Federation").  The report stated that Plaintiffs' licenses were revoked due to their delinquent state tax obligations.  Other states and licensing agencies have access to the information in these databases and they routinely check the information before licensing physicians.

After having his license temporarily revoked by Missouri, Crum transferred his practice to California where he obtained a license without incident.  After having his license temporarily revoked by Missouri, Richards renewed his medical licenses in

7

Kansas and Arkansas without incident and those states took no action against him. He was also able to obtain malpractice insurance in Kansas. Both Plaintiffs continue to hold licenses to practice medicine in Missouri.

### C.    Plaintiffs' Complaint

On July 1, 2005, Plaintiffs filed a ten-count Complaint [Doc. # 1]. The Complaint alleges that Mo. Rev. Stat. § 324.010 violates due process (Count 1); violates equal protection (Count 2); and is void for vagueness (Count 3). The Complaint further alleges that Mo. Rev. Stat. § 324.010 violates the Missouri Constitution because it is a retrospective law (Count 8). The Complaint alleges that the revocation of each of Plaintiff's license was invalid under Missouri law because the Director of DOR lacks authority to revoke a physician's license (Count 5); the Board never revoked the Plaintiffs' licenses (Count 4); section 621.045.1 requires a hearing before a professional license can be revoked and no hearing occurred (Count 6); and the Board had no authority to report to the Data Bank a revocation that was void *ab initio* (Count 7). In Count 9, Plaintiffs seek relief under 42 U.S.C. § 1983, and in Count 10, Plaintiffs seek a permanent injunction, requiring Defendants to expunge their revocations and to notify the appropriate authorities that no revocation occurred.

## II.    Plaintiffs' Due Process Claims

### A.    Plaintiffs' Property Interest In Their License

The Supreme Court has held that "[p]roperty interests . . . are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules

or understandings that stem from an independent source such as state law." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). *See also Stauch v. City of Columbia Heights*, 212 F.3d 425 (8th Cir. 2000) (looking to municipal code to determine whether property owner had protectable interest); *Dunham v. Wadley*, 195 F.3d 1007 (8th Cir. 1999) (looking to state licensing scheme to determine whether veterinarian had protectable interest).

Under Missouri law, physicians have a property interest in their licenses and they are entitled to procedural due process before their licenses are revoked. *Larocca v. State Bd. of Registration for Healing Arts*, 897 S.W.2d 37, 42 (Mo. Ct. App. 1995). *See also* Ronald D. Rotunda and John E. Nowak, *Treatise on Constitutional Law: Substance and Procedure*, § 17.4(d) at p. 61 (3d ed. 1999) ("[I]f an agency with governmental authority seeks to revoke the professional license of a doctor or lawyer, it must accord that individual a fair hearing.").

### B.     Notice to Plaintiffs

Before depriving a citizen of a property right, the property owner must be given notice and an appropriate opportunity to be heard. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985); *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 434 (1982) ("To put it as plainly as possible, the State may not finally destroy a property interest without first giving the putative owner an opportunity to present his claim of entitlement."). The right to notice and an opportunity to be heard "must be granted at a meaningful time and in a meaningful manner." *Fuentes v. Shevin*, 407 U.S. 67, 80

9

(1972).

Notice is constitutionally sufficient "if it [is] reasonably calculated to reach the intended recipient when sent." *Dusenbery v. United States*, 534 U.S. 161, 168-69 (2002). Due process does not require that a citizen receive actual notice, *Id.* at 170, only that the government provide "notice to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). "When notice is a person's due, process which is a mere gesture is not due process." *Id.* at 314-15.

### 1.    *Crum*

The Defendants undertook reasonable efforts to notify Crum that his failure to comply with Missouri tax law would result in the loss of his professional license. The Board sent Crum notice of section 324.010 in his license renewal packet. Crum received that packet and submitted his license renewal application in response. In January 2004, DOR mailed Crum "Requests for Tax Return" that advised him that his license would be revoked within ninety days if he failed to submit his 2000, 2001, and 2002 tax returns. The Requests instructed Crum to respond even if he did not believe that he was required to pay taxes. Crum's office received the Request because it mailed the Request back to DOR with a copy of an unrelated federal tax form.

In April 2004, DOR mailed Notices of Deficiency to Crum for the tax periods 2000, 2001, and 2002. The Notices advised Crum that his license was subject to revocation if he failed to pay the delinquent taxes and they instructed him to respond even

10

if he did not believe he was required to pay the taxes or if he intended to pay the taxes under protest. The Notices also advised Crum of his administrative rights to have the Director of DOR review his claim. The Notices were sent to the same address listed by Crum on his 2004 license renewal packet.

Finally, the Board notified Crum in late June 2004 that his license was subject to revocation as of July 21, 2004. This letter was sent via certified mail to Crum's business address and it was not returned to the Board. In the intervening month between when the letter was sent and the date of revocation, Crum took no action to remedy his tax issues.

The evidence amply demonstrates that Defendants took steps to provide notice that "was reasonably calculated to reach [Dr. Crum] when sent." *Dusenbery*, 534 U.S. at 168-69. Defendants submitted certified and regular mail notices to Crum and there was never any indication that Crum did not receive them. The Court acknowledges that Crum states he did not have knowledge of the revocation and that he did not receive the notices, but actual notice is not the standard for constitutionally sufficient notice. The Supreme Court in *Dusenbery* stated, "We note that none of our cases cited by either party has required actual notice in [cash forfeiture proceedings]. Instead, we have allowed the Government to defend the 'reasonableness and hence the constitutional validity of any chosen method . . . on the ground that it is in itself reasonably certain to inform those affected.'" *Id.* at 170 (quoting *Mullane*, 339 U.S. at 315)). DOR and the Board sent its Notices to the address which Crum identified in his license renewal packet, and it was Crum's employees, not the Defendants, who Crum alleges deprived him of actual notice.

11

The focus of the Court's inquiry is on the objective reasonableness of Defendants' actions rather than Crum's receipt and the Court finds that Defendants' multiple mailings to the address used by Crum were more than sufficient. *See Jones v. Flowers*, 126 S. Ct. 1708 (2006); *Dusenbery*, 534 U.S. 161; *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791 (1983); *Mullane*, 339 U.S. 306.

### 2.   *Richards*

Richards argues that the notice provided to him were insufficient to comply with due process because the Notices mailed in April 2004 and the Board's letter mailed in June 2004 were returned unclaimed.  The Supreme Court recently addressed what follow-up steps a governmental entity must take when it attempts to provide notice via certified mail and the notice is returned unclaimed.  In *Jones*, the Commissioner of State Lands attempted to notify Gary Jones that his property was subject to a tax forfeiture sale.  Jones had recently moved from the property, but his estranged wife continued to live there.  The Commissioner sent two notices of the tax sale via certified mail to Jones, but both notices were returned unclaimed.  The Commissioner did not attempt any follow-up notice.  The tax sale occurred and resulted in the title to the property being transferred to a third party.

The Supreme Court held that the Commissioner's attempted notice was constitutionally insufficient.  The Court found that Jones's failure to keep his current address updated with the Commissioner did not cause him to forfeit his right to constitutionally sufficient notice.  126 S. Ct. at p. 1717.  The Court stated that the Commissioner should have followed up and "taken reasonable steps to notify Jones" of

12

the impending sale. *Id.* at p. 1718. In evaluating what constituted "reasonable steps" the Court stated that "[w]hat steps are reasonable depends upon what the new information reveals." *Id.*

The Supreme Court reasoned that the Commissioner could have resent the notice via regular mail eliminating the necessity of a signature. The Court stated, "Following up with regular mail might also increase the chances of actual notice to Jones if--as it turned out--he had moved." *Id.* at 1719. Because the upcoming sale involved real property, the Court also found that the Commissioner could have posted a notice on the property or addressed otherwise undeliverable mail to "occupant." *Id.* The Court, however, rejected Jones's argument that the Commissioner should have searched for his current address in the telephone book and other government records like income tax rolls. The Court stated, "An open-ended search for a new address . . . imposes burdens on the State significantly greater than the several relatively easy options outlined above." *Id.*

In *Jones*, however, the plaintiff did not receive any notice of the impending sale via regular mail. In this case, Richards did receive notice via regular mail when DOR sent him the Requests in January 2004. The Requests stated:

> The [DOR]'s records indicate that you have not filed a . . . Missouri individual income tax return. If you do not file the return and pay, or make satisfactory arrangements for payment of the balance due within 90 days of the date of this notice, your professional license, certificate, registration or permit will be revoked by operation of law. (HB 600, 2003).

*See* Board Ex. 4 at p. 2. This notice was sent via regular mail and it was not returned to DOR. The Requests also instructed Richards what to do in the event he did not believe he

13

was required to file an income tax return. The Requests also gave Richards the contact information for DOR and its website address. Richards received substantially more notice than did the landowner in *Jones*.

Furthermore, the Supreme Court in *Jones* suggested that regular mail would have been a more effective means of notice because it is sent back when the addressee moves, putting the sender on notice that further attempts at notification were needed. The return of certified mail, however, is ambiguous. It might be returned because the addressee has moved or it might be returned because the addressee is obstinate.

In Richards's case, DOR and the Board had recently sent notices to the address provided by Richards and the notices were not returned. Thus, when the certified letters were returned, it was reasonable for the Board and DOR to correctly conclude that Richards's refusal to claim the latest notices was the result of choice, not because the mail was sent to the wrong address.

In his 2004 renewal packet, Richards received notice that his license would be revoked if he failed to comply with Missouri tax law. It is undisputed that he received that notice because he signed the application to renew his license on December 23, 2003. He was also sent notice by regular mail that he had not complied with Missouri tax law and his license would be revoked if he did not come into compliance in 60 days. This notice was sent to the same address as the renewal package, and physicians licensed in Missouri are required to notify the Board within 15 days of any change in address. This notice was not returned. Dr. Richards acknowledges that all of the mail, certified and

14

non-certified, was sent to the correct address and in fact he continues to use the same address. Even though the last two mailings were returned unclaimed, it would be mere formalism to require DOR to resend those communications by regular mail. Such a mailing would have been no more likely to apprise Richards that his professional license was in jeopardy than were the notices sent by certified mail to his correct address.

Given these circumstances, the Court finds that Dr. Richards was properly notified by DOR and the Board before his medical license was revoked.

### 3. *Right to Appeal Under Mo. Rev. Stat. § 621.050*

The notice Defendants provided to Plaintiffs was not constitutionally deficient just because DOR did not notify the Plaintiffs of their appeal rights.

The Court has found only one case mandating that a pre-deprivation notice include information about specific procedural rights. In *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1 (1978), the Supreme Court held that the notice sent to utility customers was constitutionally deficient where it stated that the customers' utilities were going to be cut off if they failed to pay their bill, but the notice "did not advise them of a procedure for challenging the disputed bills." *Id.* at 11. The Court stated:

> Such notice may well have been adequate under different circumstances. Here, however, the notice is given to thousands of customers of various levels of education, experience, and resources. Lay consumers of electric service, the uninterrupted continuity of which is essential to health and safety, should be informed clearly of the availability of an opportunity to present their complaint. In essence, recipients of a cutoff notice should be told where, during which hours of the day, and before whom disputed bills appropriately may be considered.

15

*Id.* at 11.

In *City of West Covina v. Perkins*, 525 U.S. 234 (1999), the Supreme Court clarified its holding in *Memphis* and narrowed it considerably. The Court noted that the administrative procedures in *Memphis* were "not described in any publicly available document" and that "notice of the procedures for protecting one's property interests may be required when those procedures are arcane and not set forth in any documents accessible to the public." *Id.* The Court explicitly stated that *Memphis* "does not support a general rule that notice of procedures and remedies is required." *Id.* In *Perkins*, the procedures and remedies available were codified in the state statutes and case law and the Supreme Court held this was sufficient notice of the remedies. The Court stated that notice of such remedies is not necessary when "state law remedies . . . are established by published, generally available state statutes and case law. Once the property owner is informed that his property has been seized, he can turn to these public sources to learn about the remedial procedures available to him." *Id.* at 241.

Based on the foregoing, the Due Process clause of the United States Constitution did not mandate notice to the Plaintiffs of their administrative appeal rights. Missouri statutes clearly set out the processes available to a licensee. Plaintiffs could have lodged a tax protest with DOR and requested an informal hearing with the Director of DOR. Mo. Rev. Stat. § 143.631. Then, if DOR issued a decision that was not favorable to them, Plaintiffs could have filed a complaint with Missouri's Administrative Hearing Commission ("AHC") under Mo. Rev. Stat. § 621.050 ("[A]ny person or entity shall have

16

the right to appeal to the [AHC] from any finding, order, decision, assessment, or additional assessment made by the director of revenue.").  Under section 621.050, the AHC must conduct a hearing after a party files a claim against DOR.  *Id.*  If the AHC had rendered an adverse opinion against Plaintiffs, then they could have appealed that decision to the Missouri Court of Appeals.  Mo. Rev. Stat. § 621.189 (providing Missouri Court of Appeals with jurisdiction over appeals from AHC in tax disputes).  Plaintiffs could have learned of these remedies by searching Missouri's statutes.

Under *Perkins*, the Notices sent to Plaintiffs were not constitutionally deficient under either the Missouri Constitution or the United States Constitution.[3]  *See also Grayden v. Rhodes*, 345 F.3d 1225, 1241-1242 (11th Cir. 2003) (relying on *Perkins* to find that notice was sufficient where tenants could have turned to city code to ascertain their right to hearing); *Evans v. City of New York*, 308 F. Supp.2d 316, 327 (S.D.N.Y. 2004) (relying on *Perkins* to find that notice was sufficient where traffic violator could have discovered his right to a hearing in the New York code).

### C.    Right to be Heard

Defendants did not deprive Plaintiffs of due process just because the Board did not conduct a hearing before revoking their licenses.  In their treatise on constitutional law, Rotunda and Nowak state:

Cases also arise where the government makes a decision based upon facts

_____

[3]There is nothing to suggest that Missouri courts interpreting the Missouri Constitution would not follow the *Perkins* decision.

Case 2:05-cv-04203-NKL   Document 43   Filed 08/29/06   Page 17 of 32

which already have been determined through some adequate procedural system such as a trial. In these situations the individual will have no further right to a hearing if the disputed issues have already been resolved by adequate process.

Rotunda & Nowak, *Treatise on Constitutional Law* § 17.8 at p. 88. In *Dixon v. Love*, 431 U.S. 105 (1977), a professional truck driver had his license revoked after he was "repeatedly convicted of offenses against laws and ordinances regulating the movement of traffic, to a degree which indicates disrespect for the traffic laws." *Id.* 112. The driver was found guilty of two traffic offense and he received a notice that, if convicted of a third offense, then his license would be revoked. A few weeks later, the driver was convicted of a third speeding charge and his license was automatically revoked without a hearing or notice.

The Supreme Court held that a second round of due process was not necessary prior to the revocation because the driver "had the opportunity for a full judicial hearing in connection with each of the traffic convictions on which the [revoking agency's] decision was based." *Id.* at 113.

Although DOR did not conduct a hearing to determine that Plaintiffs had failed to file their tax return, Crum and Richards both had an opportunity for such a hearing. The only reason there was not a hearing was because the Plaintiffs were in default, having failed to respond to the Notices sent by DOR. Both were given an opportunity for a hearing before DOR, but they did not take advantage of that opportunity. It would turn process on its head if a physician could avoid having his or her license revoked by merely

18

refusing to participate in the process.

This conclusion is consistent with *Mathews v. Eldridge*, 424 U.S. 319 (1976), in which the United States Supreme Court examined what procedures are required when the government deprives a citizen of a property right. The Supreme Court said

> [O]ur prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute safeguards; and finally, the Government's interest, including the function involved and the fiscal administrative burdens that the additional or substitute procedural requirements would entail.

*Id.* at 334-35.

The State of Missouri has an important interest in enforcing its tax law. Section 324.010 is effective in advancing the government's interest because once the Defendants understood that their licenses had been revoked, they responded to the Department of Revenue's demand letters. Nothing else had been successful.

While the Plaintiffs have a substantial interest in their licenses, Missouri's statutory system for revoking the license provides sufficient safeguards to protect that interest. The Plaintiffs were given an opportunity to have a full hearing before DOR with all the attendant appeal rights. The risk of error is small given the layers of procedure available and the fact that a physician is deemed to be in compliance with Missouri tax law if there is a reasonably founded dispute.

While there is no hearing before the Board prior to the actual revocation of the

19

license, there is very little risk of error that DOR has certified the wrong physician; i.e., one who has not received notice or an opportunity to be heard. To require the Board to conduct a separate hearing under those circumstances would rarely be more than a formality, but would impose a substantial burden on the State. Furthermore, even if DOR certified the wrong physician to the Board, the injury to the physician is readily corrected by notifying the relevant agencies that a clerical mistake was made. There is no reasonable basis to believe that a physician would be punished for continuing to practice while revoked if the physician never received notice of a tax problem and was accidentally and serendipitously reported by DOR. If this small risk of error is sufficient to invalidate a statute, then few deprivation procedures would survive because there is always a risk of clerical error.

Finally, the Plaintiffs received written notice from the Board before their licenses were revoked and had sufficient time to notify the Board that they were not the physicians that DOR had intended to certify.

Because DOR afforded Plaintiffs sufficient due process prior to notifying the Board of the Plaintiffs' failure to file income tax returns, the Board was not required to undertake a second round of notice and hearings prior to the actual revocation. *See also Kratt v. Garvey*, 342 F.3d 475 (6th Cir. 2003) (upholding automatic revocation of pilot's license without process where pilot was convicted of possession of marijuana).

## III. Plaintiffs' Equal Protection Claim

Plaintiffs first claim that section 324.010 violates the equal protection guarantees

20

of the Missouri and United States Constitution because it treats professionals differently from state employees, members of the legislature, statewide elected officials, and judges who fail to comply with Missouri tax law.

If Missouri employees fail to file their state tax returns, the employee's supervisor must notify the employee of the delinquent taxes. If the employee does not remedy the delinquent taxes within forty-five days, then the employee is immediately dismissed from employment. Mo. Rev. Stat. §§ 105.262(1) and (2).

If members of the General Assembly fail to file their tax returns, DOR contacts that legislator. If the legislator does not remedy the tax delinquency within forty-five days, DOR refers the legislator's name to the ethics committee of the appropriate legislative chamber. *Id.* at (3). The same procedures and time limit apply to elected and appointed judges in Missouri but DOR submits the delinquent judge's name to the "appropriate ethics body for disciplinary action." *Id.* at (4). The same procedures and time limit apply to statewide elected officials, but their name is submitted to the Missouri Ethics Commission. *Id.* at (5).

The Supreme Court has held that "[i]f a legislative classification or distinction 'neither burdens a fundamental right nor targets a suspect class, we will uphold [it] so long as it bears a rational relation to some legitimate end.'" *Vacco v. Quill*, 521 U.S. 793, 799 (1997) (quoting *Romer v. Evans*, 517 U.S. 620, 631 (1996)). If a state statute does not impact a fundamental right or involve suspect classifications, then it is "entitled to a 'strong presumption of validity.'" *Id.* (quoting *Heller v. Doe*, 509 U.S. 312, 319 (1993)).

21

Plaintiffs do not assert that their fundamental rights have been violated. Nor do they argue that they are members of a suspect class. *See* Plaintiffs' Motion [Doc. # 36] at p. 18.

In applying the rational basis test, courts do not "judge the wisdom, fairness, or logic of legislative choices." *Heller*, 509 U.S. at 319 (citation omitted). Courts are not authorized to "sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." *Id.* Instead, a classification "must be upheld against an equal protection challenge if there is any reasonably conceivable facts that could provide a rational basis for the classification" and the legislative body "need not actually articulate at any time the purpose or rationale supporting its classification." *Id.* at 320.

Given the minimal threshold of the rational basis test, the Court finds that section 324.010 does not violate equal protection. Missouri has a legitimate interest in getting physicians to comply with Missouri's tax laws and physicians are differently situated from government employees and, therefore, need not be treated in the same way. Statewide elected officials and judges cannot be removed from office unless constitutionally mandated procedures are followed. The legislature could rationally choose to treat them differently. As to other government employees, they are in fact disciplined more quickly and differently than professionals because government employees do not have a property interest in their job. Because the legislature has treated the groups classified in section 324.010 differently because their circumstances are

22

different, the Plaintiffs' equal protection rights were not violated.

Nor were Plaintiffs' equal protection rights violated because the legislature did not include in section 324.010 every professional licensed in the state of Missouri. The legislature may have decided to hold lawyers and doctors to a higher standard because they are perceived to be better educated and financially secure. It may have been more efficient to limit section 324.010 to professionals subject to Board supervision. Many may perceive such distinctions to be unfair or ill advised, but they are distinctions based on reason. "State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." *McGowan v. State of Maryland*, 366 U.S. 420, 425-26 (1961).

## IV. Plaintiffs' Missouri Statutory Challenges

Plaintiffs also argue that their revocations were void because Defendants did not comply with Missouri statutes. Specifically, Plaintiffs claim DOR failed to apprise them of their appeal rights under section 621.050 and the Board failed to hold a hearing before the AHC, as required by section 334.100.

### A. Notice of Appeal Rights Under Section 621.050

Section 621.050 states:

The decision of the director of revenue shall contain a notice of the right of appeal in substantially the following language:

If you were adversely affected by this decision, you may appeal to the administrative hearing commission. To appeal, you must file a petition with

Case 2:05-cv-04203-NKL   Document 43   Filed 08/29/06   Page 23 of 32

the administrative hearing commission within thirty days after the date this
decision was mailed or the date it was delivered, whichever date was
earlier.

Mo. Rev. Stat. § 621.050(1). DOR did not provide this verbatim notice to Plaintiffs.

In *State v. Elliott*, ___ S.W.3d ___, 2006 WL 1222980 (Mo. Ct. App. May 9, 2006),

the plaintiff challenged her tax assessment based on DOR's failure to apprise her of her

"right to challenge the assessment" and DOR's failure to send her a final notification of

its decision. *Id.* at *2. The court rejected that claim and held that the assessment was

valid. Given that precedent, it is clear that the failure of DOR to send the formal notice

required by section 621.050 did not invalidate the revocation of Plaintiffs' licenses.

### B. Necessity of an AHC Hearing Under Section 334.100

Plaintiffs also argue that the Board should not have revoked their licenses pursuant

to section 334.100 before holding a hearing before the AHC as required by Mo. Rev. Stat.

§ 621.050(1). Missouri law normally requires a hearing before the AHC before the Board

can take action against a physician. In *Bodenhausen v. Missouri Bd. of Registration for*

*Healing Arts*, 900 S.W.2d 621 (Mo. 1995) (en banc), the Missouri Supreme Court stated:

> The Board may discipline a physician only if the [AHC] first finds cause for
> discipline. The [AHC] may find cause for discipline only after the Board
> files a complaint with the [AHC]. Once the [AHC] issues its decision, the
> Board may impose discipline by choosing among its options to revoke or
> suspend a license, impose probation, restrict or limit a license, issue a
> warning or reprimand, deny an application, or require medical care or
> continuing education.

*Id.* at 622-23 (internal citations omitted) (emphasis in original). Thus, under normal

circumstances, the Board is required to conduct an adversary proceeding before the AHC

24

prior to disciplining a physician. *Bodenhausen*, however, was decided before the adoption of section 334.101, and must be considered when determining the applicability of section 621.050(1).

This Court is under an obligation to interpret Missouri's statutes so as not to be "hyper technical." *In re Boland*, 155 S.W.3d 65, 67 (Mo. 2005) (en banc) (citation omitted). Instead, statutory construction should be "reasonable, logical and should give meaning to the statutes." *Id.* Statutes considering the same subject matter are evaluated *in pari materia*, meaning that their provisions should be harmonized with each other. *Bachtel v. Miller County Nursing Home Dist.*, 110 S.W.3d 799, 801 (Mo. 2003) (en banc); *Wood ex rel. Estate of Lisher v. Lisher*, 187 S.W.3d 913, 916 (Mo. Ct. App. 2006). Statutes can be related "even though they are found in different chapters or they were enacted at different times." *K.C. Motorcycle Escorts, L.L.C. v. Easley*, 53 S.W.3d 184, 187 (Mo. Ct. App. 2001).

Sections 324.010 and 334.100 concern the same subject matter because they both relate to when and how a physician's license can be revoked. Reading these sections in *pari materia* , the Court finds that the legislature did not intend for the Board to conduct a separate hearing before revoking the physician's license based on DOR's notice that the physician failed to comply with Missouri tax law.

Under section 324.010, DOR makes a determination about a licensee's tax status and affords the licensee an opportunity for an internal hearing and a hearing before the AHC. Therefore, it does not make sense that the legislature intended the Board to hold a

25

second hearing before the AHC on the exact same issue, *i.e.*, whether Plaintiffs had complied with Missouri tax law. Such a result would be duplicative, with the only difference being that different administrative agencies would prosecute the action before the AHC. In addition, the Board would not be equipped to litigate whether the physician owes the taxes assessed by DOR. That issue would need to be addressed by DOR. It is illogical to conclude that the legislature intended such an irrational process. To reach that conclusion would constitute a "hyper technical" reading of the statutes in isolation. *In re Boland*, 155 S.W.3d at 67.

### C. Plaintiffs' Licenses were not Revoked by the Proper Party or Procedure

In Count IV of their Complaint, Plaintiffs contend that section 324.010 does not authorize the Director of the Department of Revenue to revoke a physician's license; only the Board can revoke these licenses. Plaintiffs are correct. Only the Board has the authority under Missouri law to revoke a physician's license, and Plaintiffs' licenses were revoked by the Board. The Board's revocation was based on the Department of Revenue's finding that Plaintiffs were not in compliance with Missouri tax law, but it was the Board that took away the Plaintiffs' privilege to practice medicine. There is no evidence that either DOR or the Board treated the certification as evidence of immediate revocation. It was the Board that notified Crum and Richards that their licenses would be revoked by operation of law as of July 21, 2004.

In Count V, Plaintiffs contend that the Board did not properly revoke their licenses

Case 2:05-cv-04203-NKL    Document 43    Filed 08/29/06    Page 26 of 32

because the Board did not have a hearing before the AHC as required by section

621.050(1). As previously explained, all Missouri statutes must be read in conjunction

with section 324.010. It would make no sense to have a second or third hearing before

the Administrative Hearing Commission on the same subject. Nor would it make sense to

have a hearing where the Board of Healing Arts litigates the question of whether a

physician owes taxes. Therefore, it is reasonable to conclude that the legislature intended

the procedures outlined in section 324.010 to control if the issue before the Board was

whether a physician's license should be revoked for noncompliance with Missouri tax

law.

## V.  Plaintiffs' Missouri Constitutional Challenges

Plaintiffs allege that section 324.010 violates the Missouri Constitution's

prohibition of vague and retroactive laws. Under Missouri law, statutes are presumed

constitutional and a court will uphold them unless they "clearly and undoubtedly" violate

constitutional limitations. *R.W. v. Sanders*, 168 S.W.3d 65, 68 (Mo. 2005) (en banc)

(citations omitted).

### A.  Vagueness Challenge

Under Missouri law, a statute is void for vagueness if its prohibitions are not

clearly defined. A valid statute "provides a person of ordinary intelligence a reasonable

opportunity to learn what is prohibited." *State v. Entertainment Ventures I, Inc.*, 44

S.W.3d 383, 386 (Mo. 2001) (en banc) (citations omitted). The purpose of the vagueness

doctrine is twofold: (1) to ensure "that laws give fair and adequate notice of proscribed

27

conduct, and (2) to protect "against arbitrary and discriminatory enforcement." *Id.* "Impossible standards of specificity are not required" and the critical test is "that the legislature establish minimal guidelines to govern . . . licensing discipline." *Duncan v. Missouri Bd. for Architects, Professional Engineers and Land Surveyors*, 744 S.W.2d 524, 531 (Mo. Ct. App. 1988) (citation omitted). "[W]here the law can be supported by any reasonable or practical construction, it will be valid, and the courts must strive to give effect to it." *Harris v. Hunt*, 122 S.W.3d 683, 689 (Mo. Ct. App. 2003). Where the statute imposes civil penalties rather than criminal penalties, courts afford the statute more tolerance because the "consequences of imprecision are qualitatively less severe." *Cocktail Fortune, Inc. v. Supervisor of Liquor Control*, 994 S.W.2d 955, 957 (Mo. 1999) (en banc).

Section 324.010 states in its entirety:

All governmental entities issuing professional licenses, certificates, registrations, or permits pursuant to [statutory citations] shall provide the director of revenue with the name and Social Security number of each applicant for licensure with or licensee of such entities within one month of the date the application is filed or at least one month prior to the anticipated renewal of a licensee's license. If such licensee is delinquent on any state taxes or ***has failed to file state income tax returns*** in the last three years, the director shall then send notice to each such entity and licensee. In the case of such delinquency or failure to file, the licensee's license ***shall be suspended within ninety days*** after notice of such delinquency or failure to file, unless the director of revenue verifies that such delinquency or failure has been remedied or arrangements have been made to achieve such remedy. The director of revenue shall, within ten business days of notification to the governmental entity issuing the professional license that the delinquency has been remedied or arrangements have been made to remedy such delinquency, send written notification to the licensee that the delinquency has been remedied. Tax liability paid in protest or reasonably

28

founded disputes with such liability shall be considered paid for the
purposes of this section.

Mo. Rev. Stat. § 324.010 (emphasis added). Plaintiffs specifically challenge the

emphasized phrases as vague. They also argue the statute is unconstitutionally vague

because it does not set forth what department actually revokes the license, nor does it set

forth the procedure for revoking a license.

Section 324.010 puts physicians on notice that their license will be suspended if

they don't file a tax return or are delinquent in paying their taxes and do not have a

reasonable basis for disputing DOR's assessment. The statute also states that DOR is

responsible for sending notice to delinquent physicians and, in the event the physician

does not resolve their tax problem, DOR notifies the appropriate licensing agency. While

it does not specifically state that the licensing agency will revoke the license, a person of

ordinary intelligence would understand that, having looked at the other relevant Missouri

statutes. In addition, section 324.010 clearly contemplates that some taxpayers may have

a dispute with DOR. A tax liability paid in protest, or one based on a reasonably founded

dispute, will be considered paid. This is not vague.

Nor is section 324.010 prone to arbitrary and discriminatory enforcement. There is

no evidence of arbitrary enforcement, and the notice provisions imposed on DOR and the

due process protections outlined previously in this Order minimize any risk of arbitrary

enforcement. The only reason that the Plaintiffs had their licenses revoked is because

they did not respond to properly mailed notices.

Given that Missouri courts routinely uphold language in licensing statutes that is substantially more vague than section 324.010, the Court is hard-pressed to find that the statute does not pass constitutional muster. *See Duncan*, 744 S.W.2d at 531-32 ("In the licensing context our courts have upheld statutes containing such undefined terms as 'unprofessional and dishonorable conduct,' 'bad moral character,' and 'misconduct or dishonesty.'") (citations omitted).

### B.     Retrospective Challenge

The Missouri Constitution states: "That no ex post facto law, nor law impairing the obligation of contracts, or retrospective in its operation, or making any irrevocable grant of special privileges or immunities, can be enacted."  Mo. Const. art. I, § 13.  "Missouri courts have interpreted this provision to prohibit any law that attaches new disabilities to past transactions or impairs the vested rights of a party."  *State Bd. of Registration for Healing Arts v. Boston*, 72 S.W.3d 260, 263 (Mo. Ct. App. 2002) (citations omitted).  The Missouri Constitution bars retrospective application of a statute except where (1) legislative intent is clearly manifested that the statute is to be applied retrospectively, and (2) the statute is procedural only and does not affect any substantive or vested right.  *Id.*

Missouri's prohibition on retrospective laws "does not mean that no statute relating to past transactions can be constitutionally passed, but rather that none can be allowed to operate retrospectively so as to affect such past transactions to the substantial prejudice of parties interested."  *Casey's Marketing Co. v. Land Clearance for Redevelopment Authority of Independence, Missouri*, 101 S.W.3d 23, 28-29 (Mo. Ct.

App. 2003) (citations omitted). Regarding whether such a vested right exists, the

Missouri Supreme Court stated:

> [A] vested right . . . must be something more than a mere expectation based upon an anticipated continuance of the existing law. It must have become a title, legal or equitable, to the present or future enjoyment of property or to the present or future enjoyment of the demand, or a legal exemption from a demand made by another . . . . In general, neither persons nor entities have a vested right in a general rule of law that would entitle either to insist that a law remain unchanged.

*Beatty v. State Tax Comm'n*, 912 S.W.2d 492, 496 (Mo. 1995) (en banc) (citations

omitted).

Because section 324.010 is only triggered by a physician's current failure to

comply with Missouri tax law, it is not being applied retroactively. Furthermore,

Plaintiffs do not have a vested right in their ability to practice medicine. *Boston*, 72

S.W.3d at 266; *State Bd. of Registration for the Healing Arts v. Giffen*, 651 S.W.2d 475,

479 (Mo. 1983) (en banc) (citing *State v. Davis*, 92 S.W. 484, 489 (Mo. 1906)). *See also*

*State ex rel. Schneider's Credit Jewelers v. Brackman*, 260 S.W.2d 800, 814 (Mo. Ct.

App. 1953) (professional licensing in the healing arts is a privilege granted by the state),

*preliminary writ made absolute*, 272 S.W.2d 289 (Mo. 1954) (en banc).

Because section 324.010 does not impact a vested right and is not being applied

retroactively, Plaintiffs' retrospective challenge to the statute must fail.

## VI.    Conclusion

Accordingly, it is hereby

(1)    ORDERED that the Missouri Director of Revenue's Motion for Summary

Judgment [Doc. # 32] is GRANTED.

(2)     ORDERED that the Missouri State Board of Registration for the Healing

Arts's Motion for Summary Judgment [Doc. # 33] is GRANTED.

(3)     Plaintiffs' Motion for Summary Judgment [Doc. # 36] is DENIED.


s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

DATE:  August 29, 2006
Jefferson City, Missouri

32